RACHELE R. BYRD (SBN 190634)
MARISA C. LIVESAY (SBN 223247)
BRITTANY N. DEJONG (SBN 258766)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
byrd@whafh.com
livesay@whafh.com
dejong@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELAINE WANG, <br><br> Plaintiff, <br><br> v. <br><br> MELLANOX TECHNOLOGIES, LTD., IRWIN B. FEDERMAN, JON A. OLSON, GLENDA DORCHAK, AMAL M. JOHNSON, JACK R. LAZAR, UMESH PADVAL, DAVID PERLMUTTER, STEVE SANGHI, EYAL WALDMAN, GREGORY L. WATERS, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Elaine Wang ("Plaintiff"), by her attorneys, makes the following allegations against Mellanox, Inc. ("Mellanox" or the "Company") and the members of the board of directors of Mellanox (the "Board" or "Individual Defendants," along with Mellanox, collectively referred to as the "Defendants"), for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100 in connection with the proposed merger (the "Proposed Transaction") between Mellanox and affiliates of NVIDIA International Holdings Inc. ("NVIDIA"). The allegations in this complaint are based on the personal knowledge of Plaintiff as to herself and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters stated herein.

## **INTRODUCTION**

1. This is an action brought by Plaintiff to enjoin the Proposed Transaction whereby the Board has agreed to sell Mellanox to Teal Barvaz Ltd. (the "Merger Sub"), a wholly owned subsidiary of NVIDIA, for $125 in cash for each share owned (the "Merger Consideration"). The Proposed Transaction is at an unfair price and on grossly unfair and inadequate terms. The Board has unanimously recommended to the Company's stockholders that they vote for the Proposed Transaction.

2. To convince Mellanox stockholders to vote in favor of the Proposed Transaction, on April 22, 2019, the Board authorized the filing of a materially incomplete and misleading Preliminary Proxy Statement on Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"). The Proxy violates Sections 14(a) and 20(a) of the Exchange Act by noncompliance with Regulation G and SEC Rule 14a-9 (17 C.F.R. § 244.100 and 17 C.F.R. § 240.14a-9, respectively).

3. Defendants have failed to disclose certain material information necessary for Mellanox stockholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

4.     In particular, the Proxy contains materially incomplete and misleading information concerning the financial forecasts for the Company prepared and relied upon by the Board in recommending the Company's stockholders to vote in favor of the Proposed Transaction. The same forecasts were used by Mellanox's financial advisors, J.P. Morgan & Co. LLC ("J.P. Morgan") and Credit Suisse Securities (USA) LLC ("Credit Suisse") in conducting their valuation analyses in support of their fairness opinions.

5.     The material information that has been omitted from the Proxy must be disclosed prior to the forthcoming stockholder vote in order to allow the stockholders to make an informed decision regarding the Proposed Transaction.

6.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violations of Regulation G and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from holding the stockholders vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, all material information discussed below is disclosed to Mellanox stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated without corrective disclosures, to recover damages resulting from Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

7.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

8. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that does sufficient business in California or an individual who has sufficient minimum contacts with California to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.  All of the Defendants conduct business and/or maintain offices in California.  The corporate office of Mellanox is located at 350 Oakmead Parkway, Suite 100 Sunnyvale, CA 94085.

9.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C.

§ 78aa, as well as under 28 U.S.C. § 1391, because Mellanox is headquartered in this District.

**PARTIES**

10.  Plaintiff has owned the common stock of Mellanox since prior to the announcement of the Proposed Transaction herein complained of, and continues to own this stock.

11.  Mellanox is a corporation duly organized and existing under the laws of Israel and maintains its principal offices in Sunnyvale, California.  Mellanox is, and at all relevant times hereto was, listed and traded on the NASDAQ Stock Exchange under the symbol "MLNX."

12.  Defendant Glenda Dorchak has served as a member of the Board since July 2009.

13.  Defendant Irwin B. Federman ("Federman") has served as a director of the Company since 1999.  Federman is also the Company's Chairman and has been since June 2013.

14.  Defendant Amal M. Johnson has served as a member of the Board since October 2006.

15.  Defendant Jack R. Lazar is an independent director of Mellanox and was put in place as part of an agreement with activist investor Starboard Value LP in June 2018.

16.  Defendant Jon A. Olson is an independent director of Mellanox and was put in place as part of an agreement with activist investor Starboard Value LP in June 2018.

17.  Defendant Umesh Padval has served as a member of the Board since February 2018.

18.  Defendant David Perlmutter has served as a member of the Board since May 2014.

19.  Defendant Steve Sanghi has served as a member of the Board since February 2018.

20.  Defendant Eyal Waldman ("Waldman") is a co-founder of Mellanox, and has served as Mellanox's president, chief executive officer ("CEO") and member of the Board since March 1999.

21.  Defendant Gregory L. Waters is an independent director of Mellanox and was put in place as part of an agreement with activist investor Starboard Value LP in June 2018.

22.  The Defendants referred to in paragraphs 12-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

23. The Defendants referred to in paragraphs 11-21 are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### *The Proposed Transaction*

24. On March 11, 2019, Mellanox and NVIDIA jointly announced that it had entered into the Agreement and Plan of Merger (the "Merger Agreement"):

> SANTA CLARA, Calif., and YOKNEAM, Israel, March 11, 2019 (GLOBE NEWSWIRE) -- NVIDIA and Mellanox today announced that the companies have reached a definitive agreement under which NVIDIA will acquire Mellanox. Pursuant to the agreement, NVIDIA will acquire all of the issued and outstanding common shares of Mellanox for $125 per share in cash, representing a total enterprise value of approximately $6.9 billion. Once complete, the combination is expected to be immediately accretive to NVIDIA's non-GAAP gross margin, nonGAAP earnings per share and free cash flow.
>
> The acquisition will unite two of the world's leading companies in high performance computing (HPC). Together, NVIDIA's computing platform and Mellanox's interconnects power over 250 of the world's TOP500 supercomputers and have as customers every major cloud service provider and computer maker.
>
> The data and compute intensity of modern workloads in AI, scientific computing and data analytics is growing exponentially and has put enormous performance demands on hyperscale and enterprise datacenters. While computing demand is surging, CPU performance advances are slowing as Moore's law has ended. This has led to the adoption of accelerated computing with NVIDIA GPUs and Mellanox's intelligent networking solutions.
>
> Datacenters in the future will be architected as giant compute engines with tens of thousands of compute nodes, designed holistically with their interconnects for optimal performance.
>
> An early innovator in high-performance interconnect technology, Mellanox pioneered the InfiniBand interconnect technology, which along with its high-speed Ethernet products is now used in over half of the world's fastest supercomputers and in many leading hyperscale datacenters.
>
> With Mellanox, NVIDIA will optimize datacenter-scale workloads across the entire computing, networking and storage stack to achieve higher performance, greater utilization and lower operating cost for customers.
>
> * * *
>
> The companies have a long history of collaboration and joint innovation, reflected in their recent contributions in building the world's two fastest supercomputers, Sierra and Summit, operated by the U.S. Department of Energy. Many of the world's top cloud service providers also use both NVIDIA GPUs and Mellanox

interconnects. NVIDIA and Mellanox share a common performance-centric culture that will enable seamless integration.

Once the combination is complete, NVIDIA intends to continue investing in local excellence and talent in Israel, one of the world's most important technology centers. Customer sales and support will not change as a result of this transaction.

**Additional Transaction Details**
Post close, the transaction is expected to be immediately accretive to NVIDIA's non-GAAP gross margin, non-GAAP earnings per share and free cash flow. NVIDIA intends to fund the acquisition through cash on its balance sheet. In addition, there is no change to its previously announced capital return program for the rest of fiscal 2020. The transaction has been approved by both companies' boards of directors and is expected to close by the end of calendar year 2019, subject to regulatory approvals as well as other customary closing conditions, including the approval by Mellanox shareholders of the merger agreement.

**Advisors**
Goldman Sachs & Co. LLC served as exclusive financial advisor to NVIDIA and Jones Day served as legal advisor. Credit Suisse Group and J.P. Morgan Chase & Co. served as financial advisors to Mellanox and Latham & Watkins, LLP and Herzog Fox & Neeman served as legal advisors.

*The Offer Price is Inadequate and Unfair*

25.     Under the terms of the Merger Agreement, Mellanox shareholders will receive $125.00 in cash for each share of Mellanox common stock owned.  The Merger Consideration agreed to in the Proposed Transaction is inadequate, and Defendants' claims that the transaction provides a great return for investors are false, in light of the Company's recent financial performance and prospects for future growth. For instance, the Company reported its stellar Quarter financial results on April 16, 2019, including record revenues achieving 5 percent sequential growth and 22 percent year-over-year growth. Operating margin was 14.6% on a GAAP basis and 28.3% on a non-GAAP basis. Additionally, the Company increased cash and short-term investments by $114 million during the quarter.

26.     In sum, it appears that Mellanox is well-positioned for financial growth, and the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

*The Materially Misleading and Incomplete Solicitation Statement*

27.     On April 22, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*Financial Forecasts*

28.     The Proxy fails to provide material information concerning the Company's financial forecasts, which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Transaction. Proxy at 47-49. These financial forecasts were also relied upon by the Company's financial advisors, J.P. Morgan and Credit Suisse, in rendering their fairness opinions.

29.     With respect to the Projections, the Proxy discloses the values and definitions of certain financial metrics, ostensibly GAAP-compliant, including Cost of Goods Sold, Gross Profit, Income from Operations, Income Before Taxes, Net Income, and Net Income Per Share. These metrics were adjusted as disclosed in the Proxy but the adjustments were unclearly defined, and the Proxy does not provide the values of these adjustments. Even if adjustments were included, it will not comply with Regulation G and may be misleading if they are not accompanied by an explanation of why the various adjustments are consistent with the measure's intended purpose.

30.     The Proxy also provides values for projected non-GAAP financial metrics for Case 1, Case 2, and Case 3 Management Projections for the years 2019-2022, including: (1) projected non-GAAP Cost of Goods Sold; (2) projected non-GAAP Gross Profit; (3) projected non-GAAP Total Operating Expenses; (4) projected non-GAAP Income from Operations; (5) projected non-GAAP Income Before Taxes; (6) projected non-GAAP Net Income;

(7) projected non-GAAP Net Income Per Share; and for the years 2019-2027: (8) EBITDA; (9) EBIT; (10) EBIAT; and (11) unlevered free cash flows; but fails to provide: (i) the value of certain line items used to calculate these non-GAAP measures, or (ii) a reconciliation to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a). *Id.* at 68-70.

31. The SEC has indicated that if the most directly comparable GAAP measure is not accessible on a forward-looking basis, the company must disclose that fact, provide any reconciling information that is available without unreasonable effort, identify any unavailable information and disclose the probable significance of that information. A company is permitted to provide the projected non-GAAP measure, omit the quantitative reconciliation and qualitatively explain the types of gains, losses, revenues or expenses that would need to be added to or subtracted from the non-GAAP measure to arrive at the most directly comparable GAAP measure, without attempting to quantify all those items.

32. When a company discloses non-GAAP financial measures in a registration statement that were relied on by a board of directors to recommend that shareholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all forecasts and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

33. Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Mellanox included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and

effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherrypicking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

34.  The SEC has repeatedly emphasized that disclosure of non-GAAP forecasts can be inherently misleading, and has therefore heightened its scrutiny of the use of such forecasts.[2] Indeed, the SEC's Division of Corporation Finance released a new and updated Compliance and Disclosure Interpretation ("C&DIs") on the use of non-GAAP financial measures to clarify the extremely narrow and limited circumstances, known as the business combination exemption, where Regulation G would not apply.[3]

35.  More importantly, the C&DI clarifies when the business combination exemption does not apply:

> There is an exemption from Regulation G and Item 10(e) of Regulation S-K for non-GAAP financial measures disclosed in communications subject to Securities

---

[1]  Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (last visited Mar. 7, 2019) (emphasis added).

[2]  *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE AND FINANCIAL REGULATION (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/ (last visited Mar. 7, 2019); Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. TIMES, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0 (last visited Mar. 7, 2019).

[3]  *Non-GAAP Financial Measures*, U.S. SECURITIES AND EXCHANGE COMMISSION (Apr. 4, 2018), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm#101 (last visited Mar. 7, 2019). To be sure, there are other situations where Regulation G would not apply but are not applicable here.

Act Rule 425 and Exchange Act Rules 14a-12 and 14d-2(b)(2); it is also intended to apply to communications subject to Exchange Act Rule 14d-9(a)(2). This exemption does not extend beyond such communications. Consequently, if the same non-GAAP financial measure that was included in a communication filed under one of those rules is also disclosed in a Securities Act registration statement, proxy statement, or tender offer statement, this exemption from Regulation G and Item 10(e) of Regulation S-K would not be available for that non-GAAP financial measure.

*Id.*

36.     Thus, the C&DI makes clear that the so-called "business combination" exemption from the Regulation G non-GAAP to GAAP reconciliation requirement applies solely to the extent that a third-party, such as a financial advisor, has utilized projected non-GAAP financial measures to render a report or opinion to the Board.  To the extent the Board also examined and relied on internal financial forecasts to recommend a transaction, Regulation G applies.

37.     Thus, to bring the Proxy into compliance with Regulation G as well as cure the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

*Financial Analyses*

38.     With respect to J.P. Morgan's *Discounted Cash Flow* Analysis, the Proxy fails to disclose the Company's: (i) unlevered free cash flows; (ii) the line items used to calculate each company's unlevered free cash flows utilized by  J.P. Morgan; (iii) the basis for J.P. Morgan's selection of the terminal growth rates ranging from 2.5% to 3.0; and (iv) the basis for the selected perpetual growth rates ranging from 2.0% to 3.0%, including the assumptions for calculating the Company's weighted average cost of capital.

39.     With respect to Credit Suisse's *Discounted Cash Flow* Analysis, the Proxy fails to disclose the Company's: (i) unlevered free cash flows; (ii) the line items used to calculate each company's unlevered free cash flows utilized by  Credit Suisse; (iii) the basis for Credit Suisse's selection of the terminal value multiples ranging from 7.5x to 10.5x; (iv) the basis for the selected discounted rates ranging from 9.0% to 12.0%, and (v) the Company's outstanding shares.

40.     In sum, the Proxy independently violates both: (i) Regulation G, which requires a

presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Mellanox shareholders.

41. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff will not be able to make a fully informed decision regarding whether to vote in favor of the Proposed Transaction, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**FIRST CAUSE OF ACTION**
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act**
**and 17 C.F.R. § 244.100 Promulgated Thereunder)**

42. Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

43. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

44. As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

45. The failure to reconcile the numerous non-GAAP financial measures included in

the Proxy violates Regulation G and constitutes a violation of Section 14(a).

**SECOND CAUSE OF ACTION**
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act**
**and Rule 14a-9 Promulgated Thereunder)**

46.     Plaintiff repeats and re-alleges each allegation set forth above as if fully set forth herein.

47.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

48.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading." 17 C.F.R. § 244.100(b).

49.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial forecasts for the Company.

50.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

51.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.

The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

52. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

53. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial forecasts.

54. Mellanox is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

55. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

56. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**THIRD CAUSE OF ACTION**
**(Against The Individual Defendants for**
**Violations of Section 20(a) of the Exchange Act)**

57. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58. The Individual Defendants acted as controlling persons of Mellanox within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as

officers and/or directors of Mellanox, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

59. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the Proxy.

61. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

62. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

63. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

1    64.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.    In the event that the proposed transaction is consummated, rescinding it and setting it aside, or awarding rescissory damages;

C.    Awarding compensatory damages against Defendants, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law, arising from the Proposed Transaction;

D.    Awarding Plaintiff the costs and disbursements of this action and reasonable allowances for fees and expenses of Plaintiff's counsel and experts; and

E.    Granting Plaintiff such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED: May 3, 2019

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:    */s/ Rachele R. Byrd*
RACHELE R. BYRD
MARISA C. LIVESAY
BRITTANY N. DEJONG
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
byrd@whafh.com
livesay@whafh.com
dejong@whafh.com

|   |   |
|---|---|
| 1 | |
| 2 | **Of Counsel**: |
| 3 | **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP** |
| 4 | GLORIA KUI MELWANI |
| 5 | 270 Madison Avenue<br>New York, NY 10016 |
| 6 | Telephone: (212) 545-4600<br>Facsimile: (212) 686-0114 |
| 7 | *Counsel for Plaintiff* |

804363